Good morning. Good morning, Your Honors. May it please the Court, I'm Alan Gura, Institute for Free Speech. I represent Professor Damon Johnson, and I would like to reserve four minutes for rebuttal. Okay. Your Honors, perhaps the best way to approach this case is to see that it's really two separate cases, each of which can stand on its own, but with one overlapping theme. The case that Professor Johnson first brought in the original complaint centered on the District's unusual application of the Education Code and its civility policy to punish dissenting viewpoints. Johnson soon amended his complaint to add what is essentially a second related case, when the State's new DEIA regulations and the Chancellor's associated competencies and criteria began impacting him. So while the situation at Bakersfield College was already intolerable and warranted injunctive relief before the advent of the DEIA regulations and the Those items added essentially a new dimension to the same basic problem. You agree that the DEIA regulations require the community college district to promulgate certain policies, but the college district hasn't done so, right? They have not done so. That's correct, Your Honor. However — So why shouldn't you have to wait until that happens so we can know the full scope of what they're doing and evaluate whether it's violating any laws? For several reasons. The first reason is, Your Honor, under Section 53602B, they are in the absence of their locally developed policies. And by the way, we found out, and it's cited in our brief, that one of the reasons that they were slow in promulgating their local policies is because they perceived Magistrate Judge Baker's decision in this case as suggesting they shouldn't do that. But in any event, they are required to apply either their local policies or the Chancellor's  Could you point the specific section that requires that, please? Okay. So I believe it's Section 53602B says that they have to use — there are two sections, Your Honor. Okay. The first, the overarching section is if you first go to 53602C, you'll see that districts shall include DEIA competencies and criteria as a minimum standard for evaluating the performance of all employees. And then Subsection 4, it goes on to say they should place significant emphasis on But look at A. It says district governing boards shall adopt policies. And you're saying that they haven't adopted those policies. And similarly, with C, they're supposed to adopt these policies to then advance these principles, and they haven't done that yet. So I guess that's my issue with 53602.  But in the absence of — Is there another section? There are other sections, Your Honor, and it's in our brief, I believe. I could find that. I apologize if I don't have that right handy. But in the absence of their local policies, they are still applying the chancellor's competencies and criteria. And you still have the problem of 53605, which — But point me to the section that says that. In the absence of the community college district not promulgating its own policies, implementing the chancellor's criteria, that the chancellor's criteria has to apply. I didn't see that, but I could have missed it. Your Honor, it doesn't use the language, like, in the absence of. I believe it uses the disjunctive word or, and it's definitely — Right, but that — okay, but that is 53602A, and this is what it says. District governing boards shall adopt policies for the evaluation of employee performance, including tenure reviews that requires demonstrated or progress toward proficiency in the locally developed DEI competencies or those published by the chancellor pursuant to section 53601. That's right. So that still says that district governing boards shall adopt policies that promote the, either the locally developed DEI competencies or the chancellor's. Well, the — The problem is, it still starts with the district governing board shall adopt policies. And if that hasn't happened, I'm not sure how A gets triggered.  The way we read it is that it's not optional for them. They can't simply refuse to issue any policy and then ignore Title V of the California Code of Regulations. They have to — they shall apply DEI standards in evaluating it. It's stressed that this has to be something that is — But if it hasn't happened, what policies are you challenging? Because they don't — they haven't implemented them yet. Okay. They are going to be following the chancellor's competencies and criteria, because that's — that is — you know, if they don't get around to issuing their own policies, it's an or. They should follow the chancellor's competencies and criteria. And in any event, Professor Johnson does not have any option in terms of 53605, which commands him to teach this ideology. And if he doesn't do so, then what he's going to find out in his next performance review, which is going to be next year, is that they're going to apply the education code and say that under subsection F of 8233 — I mean, of 87732F, that he didn't follow a regulation that's promulgated by the governors, and he could find himself out of a job. It is not optional. So what if I agreed with you on 53605 on the faculty members shall employ teaching practices that reflect DEI and anti-racist principles in terms of standing, but I'm asking you about these other regulations where there's been no policy to implement them. And I'm looking at the definitions for the regs, and it defines diversity as also based on religion, on marital status, on mental and physical ability. I just — there may be some implementations of these policies that Mr. Johnson might agree with. It might even be lawful, correct? But you're asking us that they should be enjoined, even though they haven't been enacted yet, and they could be lawful, and Mr. Johnson may actually approve of some of them. There's nothing lawful, and Mr. Johnson does not approve of anything related to DEIA and anti-racist principles, which is, it starts with the command that he must — shall employ teaching, learning, and professional practices that reflect DEIA and anti-racist principles. Professor Johnson's understanding of DEIA and anti-racist principles, and I believe this is the — what the general literature describes, is not traditional sort of, you know, nondiscrimination requirements that we have had, you know, starting largely in the 1960s with the various laws that were promulgated along those lines. This is a particular ideology that's a little bit more recent. It's defined extensively in this accompanying glossary that the State has put out. And this is a very different thing. This is about understanding and acknowledging that everything is racist, that racism permeates every single system or structure or law. He is required to identify this supposed racism. He is supposed to confess his own sins in having been a racist. He does not want to do that. He is supposed to — Let me ask you. You didn't seek a preliminary injunction in joining enforcement of the DEI competencies and criteria of the Chancellor. Are you challenging those now on appeal? I believe that we are challenging the enforcement of — But you didn't seek a preliminary injunction. To enjoin those. We do seek — I'm looking here at ER 98, which is the notice of preliminary injunction. You're right, Your Honor, it does not list the competencies and criteria specifically. However, the competencies and criteria are a way of understanding those regulations which we are seeking an injunction against. Well, I have a bit of another issue with you. So, your time's going down, but I want to raise. The district court dismissed your complaint with leave to amend. And so, it seems like you want to have your cake and eat it on some level. Because putting aside the issue of whether the district court properly dismissed your first amended complaint for lack of standing, could you allege additional facts in an amended complaint that would cure the deficiencies identified by the district court? In other words, could you file a second amended complaint that remedies the issues the district court allowed? And I'm looking at the cases that you cited that you didn't file an amended complaint. I don't know why you didn't, but I'm having trouble — I'm in an exercise-pendant appellate jurisdiction, and I don't see any cases where that's happening, where the order was dismissing with leave to amend. So, you're wanting sort of this special remedy here. But you could have just amended. Or you could have gone back to court and you should have said, I'm not going to enter a final judgment here, and then — but we have to go through a lot of hoops to get to what you want to talk about. No, Your Honor. First of all, in Baldwin v. Sebelius, the district court dismissed the complaint with leave to amend and simultaneously dismissed a preliminary injunction motion. Lack of standing was the common ground for both rulings, and there was a pendant jurisdiction in that case. That is identical to the situation we have here, Your Honor. We didn't — we don't believe that there are any deficiencies in the complaint. These allegations are highly specific. I know that Your Honor sees a lot of cases. But you could have just gone in and you could have said, hey, we're not going to amend. Make it a final judgment. I'm appealing right now. Because I can't guess, Your Honors, what an appellate court would — might say. So if — if I'm wrong and this Court wants to identify some specific deficiency, if the panel were to issue an opinion that says, oh, this is the type of fact that's missing, and if only you were to say, you know, X, Y, Z — But you kind of want us to give an advisory opinion. No, Your Honor. I'd like to have — for my client to get relief. The way this case has been handled has been very unusual relative to what we typically would expect of a First Amendment preliminary injunction case. The — if Professor Johnson doesn't have standing, I don't know who has standing in the Ninth Circuit. He has a 107-paragraph, blow-by-blow, chapter-in-verse, detailed complaint showing exactly the type of speech that he is — that he is being chilled from exercising. It is speech that is identical or substantially similar to speech that's previously been the subject of discipline. He's got a mandatory regulation. And he's not been disciplined. In fact, the one investigation actually absolved him of any violation. Well, the process is the contrary.  The investigation threatened him with additional investigations if another professor dislikes his Facebook postings about politics. All of the things that he said he did was reviewed, and he was found not to be in violation. You agree with that, right? So I guess, you know, my — Your Honor. We don't — we don't live in a country — So it's not that he didn't have — he could have standing, right? He could wait until these policies are actually promulgated. He could see if they're applied or threatened to be enforced against him. And then he could sue again. He is chilled today because he is mandated to teach things that he disagrees with. He is going to be evaluated based on his self-actualization and promotion of this particular ideology. You have the defense coming and saying there's no such thing really as academic freedom. It's a collective right of the faculty to determine which opinions are going to be promulgated. And he's got a factual record where they fired somebody because they misattributed his Facebook postings to that fired individual. Let me find out if Judge Batey wants to ask any questions. I do want to ask you a question. So standing is not dispensed in gross. So if we parse through all of these regulations, the competencies, the statutes, the policies, and we were to conclude that your client has standing based on some but not others and remand it to the district court, where is the harm to your client? The harm is that if this Court does not actually direct the entry of a preliminary injunction, justice delayed is justice denied. We have a preliminary injunction motion that was filed in 2023. It is today 25. His performance evaluation is going to be spring of 26. But that's a different issue. We could remand it for the district court to consider that. The district court didn't grant the injunction because it concluded that your client didn't have standing. But if we were to conclude that he has standing on some basis, perhaps on some basis but not on others, and send it back, then the district court has to consider the injunction at that point. I don't know why that means that your client doesn't get relief or potentially at least have the argument for relief. I mean, we — Because relief in a preliminary injunction urgent situation, we have Elrod V. Burns, you know, a denial of First Amendment rights is an irreparable harm. Every day that goes by that he can't speak, that he can't post to Facebook, host speakers, recommend books, teaches class because he's afraid of ending up like Professor Garrett. Every single moment that that happens is an irreparable injury. And in Planned Parenthood, a case that the other side brought up, this Court found when the proper resolution is beyond any doubt, when injustice might otherwise result, when an issue is purely legal, those are all exceptions to the general rule where you kick it back to the district court for first decision. And the fourth factor mentioned by this Court five years ago in Planned Parenthood is the effect a delay would have and whether significant questions of general impact are raised. I think this case is in all fours with Planned Parenthood. We can't have a situation where this type of situation is allowed to occur and persist. The district court did not respond for months and months to our motion to expedite consideration of the preliminary injunction. We had to file a petition from Mandamus just to get the district court to pick up the case, and then we have this hear no evil, see no evil denial of, you know, the record entirely. You have the district court saying that there are no details that are actually provided in the declaration that are asserted in the complaint. We know what the district court thinks of this case. Now, that's okay. District judges always disappoint one side or the other in every case, and we can handle that. But if a district judge sees a First Amendment case that has even a plausible chance of having some merit, and the district court sits on it, doesn't work to expedite, has to, you know, be dragged into this type of state.  I think we know your argument. I want to make sure, because you're out of time. Thank you, Your Honor. But wait. I just want to see if anyone's got any additional questions. No, thank you. Okay. I'll give you two minutes on rebuttal.  Because we had a lot of questions for you. Good morning, Your Honors. Good morning. Jay Russell from the California Attorney General's office on behalf of Sonia Christian, Chancellor of the California Community Colleges. We're here today on the appeal of a motion for preliminary injunction. And the motion for preliminary injunction was denied because the underlying case was dismissed. And therefore, the preliminary injunction motion was moot. There's no underlying action that would support allegations of a preliminary injunction motion. What if we disagree? Why shouldn't we exercise pendent appellate jurisdiction? I'm sorry, Your Honor? What if we disagree and the basis of the P.I. denial was solely the motion to dismiss order? So why shouldn't we exercise pendent appellate jurisdiction? Because there's not a final order in the district court, Your Honor, that the motion to dismiss with leave to amend. Under WMXTAC, this Court does not have jurisdiction to hear that case until there is a final decision. And so what's happened here is the plaintiff has pulled along the underlying case with his preliminary injunction motion, although it's still pending in the district court. Justice Wallace of this Court has written in concurring opinions — There is no justice on the Ninth Circuit. There is no justice on the Ninth Circuit. Judge Wallace? Judge Wallace. I apologize, Your Honor. Thank you. Judge Wallace has written recently in a couple of concurring opinions that — to express his concern that in some cases, parties appeal orders granting or denying motions for preliminary injunctions in order to ascertain the views of the appellate court on the merits of this litigation. And I would submit that that's exactly what's happening here, Your Honors, is the only thing that has been appealed is the motion for preliminary injunction. And that had to be denied as moot once the underlying case was dismissed. But he said that the appellant didn't have standing, right? That's correct, Your Honor. What if we think that the district court's all wrong on that? What if we think, based on this, that he — that the appellant does have standing on something, maybe not all, but on something? Well, this — We — then we get to the pendant jurisdiction, whether we exercise that. Well, this Court's — this Court's jurisdiction is — or this Court's review should be very limited on the motion for preliminary injunction. And it should be looking at whether or not there is an abuse of discretion or whether or not there was — Well, but whether someone has standing is a little bit more. I think that — didn't the magistrate judge find standing? And then the district court went against that, right? That's correct, Your Honor. All right. But nevertheless, what we're hearing — Kind of a legal issue. That is a legal issue. Yeah. But that legal issue is still pending with the district court because there's been leave to amend that's been granted. But he's saying right on the facts alleged that there's not enough for standing. But what if this Court feels there was enough on the facts alleged? Well, it would do so if it found that the district court either abused its discretion or based its decision on — that its decision was legally erroneous. And again, this Court in many instances has said that when a motion for preliminary injunction is denied, when it's denied when it's moot, that is almost the only possible outcome when there's no — when there's no case pending. Here there is — procedurally, there is no case pending. If the court were to — to review the merits of the underlying action, which still is within the district court, I would submit that the district court did get it right. The district court looked at — primarily at the Dry House case and determined that the chancellor, most importantly, had no ability to enforce anything against staff like Professor Johnson. Well, but this — the chancellor could be a different situation than some of the other people, too, right? You're just — well, the chancellor didn't, but there are other people that — that if there — aren't there other defendants besides the chancellor? There are, Your Honor. I'll allow my colleague to address that. But as far as — So maybe the chancellor wins. Right. But maybe the other — then you could throw the other people under the bus. And my colleague will answer that, Your Honor. Let me ask, are you willing to disavow on behalf of the chancellor any intent to enforce the provisions at issue here against Mr. Johnson based upon his proposed speech described in the complaint? Well, again, the regulations that are being challenged here are applicable to the districts. The California Community Colleges drafts those regulations, and they apply them to the districts, not directly to individuals like Professor Johnson. So is that a disavowal or not? I couldn't tell. I mean, is your point just that the chancellor herself doesn't have authority to enforce the district's — the community college district's regulations against an employee of that district? That's correct. Under the Education Code, Your Honor, the personnel decisions like that are left to each of the individual districts. California Education Code tries to provide individual districts with as much latitude as possible to make those kinds of decisions. So if the chancellor doesn't have authority, then why can't you just represent here on the record in open court that the chancellor will not enforce these regulations against Mr. Johnson? That is what the district court found, Your Honor, that there's no chance. In fact, that's not even a litigation position. That's a position that's within the Education Code. Why can't you tell us that that's correct, that chancellor will not enforce them? I believe that that's correct, Your Honor. That's as good as it gets. Any other questions? Your time's up. Thank you. Thank you. Good morning. May it please the Court. David Urban for the current community college district defendants. In this case, the district court correctly found no case or controversy under Article 3. The rules that Plaintiff Johnson challenges do not prohibit the speech in which he seeks to engage. I'll talk first about the standards that are applicable only to the current community college district defendants and talk about the chancellor's regulations in a moment. The Education Code prohibits unprofessional conduct, dishonesty, unfitness. Their policy 3050, which the plaintiff also challenges, it's a civility bullying policy. Now, Johnson said in his papers, in his First Amendment complaint, what he intends to say, classes he intends to teach, other speech in which he seeks to engage. None of that is unprofessional conduct, dishonesty, unfitness. It's not bullying. It's not a lack of civility. For that reason, there is really no Article 3 standing in this case. There's no challenge to be entertained. So, are you avowing in open court on behalf of the community college defendants that none of these regulations will be applied to Professor Johnson based on his teaching and scholarship and the positions he takes about these DEI policies? Well, let me go to the Education Code and Board Policy 3050. You can say yes or no. That would be okay. That's what lawyers do to witnesses. Understood. I have to qualify the way... I mean, one of the ways that you would show that the dry house factors are not satisfied is if there's no threat of enforcement. Certainly. There's no threat of harm to the plaintiff. And if, are you willing to make that avowal? You just said his classes he wants to teach, his statements don't fall under lack of civility or bullying, et cetera. But do they fall under something else within those policies that could lead to his termination? Well, I'm going to provide a disavowal. Judge Koh asked for a specific disavowal from my friend, and I'm going to provide something very similar, but I have to do it in sort of a complex way. We have three items at issue, the Education Code, Board Policy 3050, and then the Chancellor's regulations are the third, a little bit more complex. The Education Code, Board Policy 3050, we are not going to enforce those against Professor Johnson for anything he has said he's going to do in his plea. And what numbers are you putting in that? You had three buckets. You said California Education Code? Is that 87732 and 87735? Yes. Okay. You're not going to enforce that. Okay. Let's just go, Policy 350, what's your view on that? No, it's not bullying and civility what he says he would like to do. What about the DEI statement? Those are rating criteria, and we have to apply those to faculty. The issue for this case and the problem for standing is that there's no local implementation in the record. So we don't, in some respects, we don't know exactly what Johnson's going to say, and we don't know exactly what rules he's going to be judged under, which is a decisively defeat standing. Let me quickly go to another point for... What about the competencies and criteria? Those are guidance documents. It's Exhibit A and B to Johnson's declaration. Those specifically state the Chancellor thinks those are, you know, of use potentially, but they are not required to be implemented by community college districts. Let's go to one other point that was discussed previously. The regulation section 5-6... I'm sorry, 5-3-6-0-5. Yeah, let's do 5-3-4-2-5, 5-3-6-0-1, 5-3-6-0-2, and 5-3-6-0-5. Are you disavowing those? Well, we have to rate faculty on those, but there's no local implementation in the record. So this Court has no basis to rule on those at that point because we don't know how they're going to be implemented. Each of those provisions that are mentioned, they're either precatory language, 5-3-2-0-1 and... I'm sorry, 5-3-200 and 2-0-1, it's just precatory language. 5-3-4-2-5, that talks about local implementation. It talks about being able to work appropriately with members of a diverse community, as described by local implementation. The other ones... I'm going to jump to 5-3-6-0-5, which is the one that doesn't talk about local implementation. That says, you shall employ certain teaching practices. So that... Someone would say that's a straight shot to my client, but no local interpretation required because it just says, faculty will do this. And the point's been made that, okay, you don't need local implementation for that. But local implementation actually is needed because one has to understand you have to implement diversity, as described by the Chancellor's regulations, and also anti-racism. And those are left to the local district to implement and to define. Where does it say that? I don't see that in 5-3-6-0-5. It just says, faculty members shall. Staff members shall. That's correct, Your Honor. It's not stated in there, but it's very much implicit. Why? Because one has to understand what... how anti-racism is defined by that particular community college district and how the diversity standards are defined by that particular community college district. Other sections talk about how you have to implement... Are there no... The community college district has not implemented any of its own DEI and anti-racist principles? Those are not in the record, Your Honor. Does that mean they don't exist or that means they're not in the record? It means they're not in the record. The district, the colleges are obligated to make some response to these regulations. And I don't want to say we've done nothing. I don't want to... I'm not in a position to have to say what we did because there's no standing and because it's not on the record. Are there any policies implementing the DEI regulations? I believe there are. And what are those? At this point, I don't think... I'm sorry, Your Honor, but I don't want to supplement the record. It's plaintiff's burden to present evidence to this court. Your court... I had anticipated today that this court would ask that very reasonable question, but I'm not in a position to be able to answer it. Do you want to say that there's not sufficient information for us to conclude that he has standing, but you also won't acknowledge what any potential policies say? It's what's not on the record. I could say what I believe they are, but it wouldn't be meaningful for this court. And plus, it's not evidence. So I could say it here, and then it's not going to be something that this court could rely on as evidence. Are those policies publicly available? So that if this case were remanded, plaintiffs could read those policies and amend their complaint? They could. I'm sure they could find those policies. We're talking about remand. There's a dismissal without prejudice. So we could conceivably have a finding of what those policies are and another complaint. I mean, this underscores the rightness issue, right? The record doesn't show that these policies have been implemented locally, and counsel for Mr. Johnson conceded that. So we really don't know exactly what's being challenged. Exactly, Your Honor. So to conclude, there's an issue of threat of enforcement for standing. There has to be an intent to engage in a certain type of activity. There has to be prohibition by the statute at issue. And then there has to be threat of enforcement. So for threat of enforcement, there's very little in the record that goes to that. I'm going back to Board Policy 3050 and the Education Code provisions. We've got a statement by a trustee. There's, as was discussed previously, the investigation of Johnson that was finding that he didn't actually engage in something that would be disciplined. He talks about what he wants to do in terms of... Yes, but someone a lot like him with a lot of similarities got fired. So that's looming out there. I don't... It's very much different conduct, Your Honor. We've... I think previously we've kind of... Well, except he had the same... They had the same jobs and similar ideologies. It didn't go well for the other individual. But Johnson has not said that he wishes to engage in any of the conduct that Garrett engaged in. And that's clear from the record. I'll leave it at that. We've said that we're not going to punish Johnson for what he's described in his pleadings. If someone came to... Maybe after you settled for a lot of money with the other guy that you fired, right? Well, I don't... I can only talk... That's it, yeah. So in Mr. Garrett's case, there was two documents. There was a notice. I can't remember exactly what it was called. Some sort of notice of the charges or the issues. And then there was a notice of termination. And the first of those documents listed this policy, this 3050, but the second didn't. That's correct, Your Honor. So why is that not sufficient to give Mr. Johnson some concern that that policy would be invoked against him? Because he doesn't wish to engage in any of the conduct that's the subject of the disciplinary notice for Garrett. Well, going on a podcast and posting things on Facebook, speech, political speech, basically. So you're saying there's something Mr. Garrett did beyond those things? Yes. He engaged in a great deal of... He filed a lot of complaints that were found to be unsubstantiated, many complaints. He made false statements about his colleagues. It's all detailed in those notices that Johnson has attached to his pleadings. But it is very distinct. Johnson says he wants to teach particular things in his classes. None of Garrett's speech is classroom speech. Johnson says he wants to recommend books or talk about other issues, have guest speakers on campus. And that's not what Garrett was punished for. Couldn't Mr. Johnson go on the podcast? Could he post things on Facebook? Would all of that be permissible? Everything that he said in his complaint, as stated, is permissible. I did say previously that on remand, the plaintiff could amend the complaint. Are there any additional questions? Well, I'd like to hear him complete the statement. What were you going to say about remand? I don't want to waive any of my clients' available litigation options with regard to an amended complaint. I guess I'm just presenting that for the record. I mean, I said that, but I think we would want to... Are you walking it back? You just said? Being cautious and just reserving rights. Are you standing by it or are you walking it back? Are you taking it back? There's a dismissal with leave to amend. And I'll leave it at that. If there's leave to amend, then he's allowed to do so. Well, I think what you said was everything that Mr. Johnson says he wants to do, you'll let him do. Oh, certainly. I'm talking about the complaint. It's a procedural. Just I said before that he can just amend his complaint. For the saying what we're not going to dismiss him for, that is on the record, and that's clear, and it's not walked back. But all the speech in his complaint now, you're saying is permissible and you will not enforce any of these rules against him. Based on what's in the current complaint, but you're saying you want to wait and see what any future complaint alleges. Is that... I'm sorry. I'm talking about the litigation, the actual complaint, first amended complaint. So procedurally, yeah, and everything that's in the papers that Johnson has described he wants to speak on and do, we're not going to punish him for that under the board policy 3050 or the education code. Or any of these other regs that we're talking about. Well, he has to be rated under those regs, but we don't know what the standards are yet. There's no local implementation. So I can't say we're not going to rate him under the chancellor's regulations because we have to rate all faculty. But what... But you haven't implemented the policies that would incorporate this chancellor's competencies and criteria. Certainly, that's not in the record. And I hasten to add that they could be very much... They could say, look, professors can disagree with these principles. They have to comply with the regulations, that they're free to present both sides, educate their students on different points of view. This local implementation could be very generous and could make clear that Professor Johnson's not going to be penalized for particular viewpoints. But he says his speech is chilled. And Professor Garrett was fired. He's not doing certain things, not hosting speakers, not posting things online. He's not going on radio programs or podcasts. And it doesn't seem that anything you've said here today would give him any comfort, that he should go ahead and say the things he wants to say without fear of being terminated from his job. Well, I can't go much beyond what he's pleaded in his complaint and say that he's not going to be punished for that. I mean, if... And he hasn't been punished thus far. And he's been doing what he said he's been doing in the complaint, correct? That's absolutely correct, Your Honor, which is a further indication that he's not going to be punished for it. Since we — everyone knows he's doing this, has done this, and there's no punishment for it. Okay. Thank you. Thank you, Your Honor. Two minutes for rebuttal. Your Honors, this is a little bit ridiculous. Let's go to the brief that my colleague filed in November, page 61. I'm quoting here. No one, not the district nor the court, can evaluate this disruption until Johnson actually engages in conduct that violates district rules. And that's the same position they took with the district court. If you look at the district court docket 72 at 23, their objection to the MPI recommendations, they declared that they couldn't decide whether Johnson's speech is punishable until he actually expresses it. And so here we are after years and years of litigation, and when he has suggested to give certain answers, my... But that's based on the fact that thus far they don't think anything he said does violate the policy, right? Well, they — actually, that — Your Honor, that's actually not true because they punished Professor Garrett for Professor Johnson's speech. But Professor Garrett violated the COVID restrictions. No. So he threatened a trustee of the district. His conduct was different. And Mr. Johnson said, I'm not going to do that, right? Okay, so first of all, Your Honor... Well, let me ask you, did Professor Johnson violate campus COVID-19 policies? I don't know, Your Honor, but I do — here's what I do know. Is that in the record that he violated COVID-19 policies? There's an allegation that he did. Here's — but the record also — so they put out a warrant. I'm sorry. I just want to go through the Garrett conduct because if this is all riding on Garrett, I think it's a fair comparison. So did Mr. Johnson ever threaten a trustee, as Mr. Garrett did Trustee Corkins, or ever express the intent to do so? No, he did not do that, Your Honor. Okay. Did he ever violate — who alleged that he violated the COVID policies? I'm — I'm sorry. I must have missed that in the record myself. Someone in the district did, but, Your Honor... Can you give me the citation and I can go back and look at it? To — to — if I may use my time.  I don't know who alleged — made allegations against Professor Garrett. It's this — I think it was Dean McGraw that brought the initial set of charges. But let's look at the long list. There are 17 things that were alleged against Garrett that are pure First Amendment speech. The first —   Who — You need to answer, Judge Koh. Who — who alleged that Mr. Johnson violated COVID-19 policies? Mr. Johnson was not accused of violating COVID-19 policies. Okay. Thank you. Okay. What about making that there was a third-party investigator who found that representations were not true, but did Mr. Johnson keep making these — you know, a third-party investigator found allegations against colleagues in the school were not true? Did Mr. Johnson knowingly repeat these false representations? And does he intend to do so? Because that is — Mr. Johnson did not do any of those things. And he was not accused of doing those things. Okay. So I think there are some pretty stark contrasts between Professor Johnson and Professor Garrett. No, Your Honor. The reason I would say that, well, of course he's not the same person. He's not identical. He's not going to copy every single thing that Professor Garrett said and did. However, if we look at the allegations against Professor Garrett, Mr. — Professor Johnson will actually say and do the exact same things. The very first allegation against Professor Garrett was that he wrote an op-ed in Bakersfield, California that criticized cultural Marxism. So the words cultural Marxism, Professor Garrett denied that they were hate speech. And this was the first thing they thought of to charge him for termination. So Professor Johnson went back and said, gee, 15 of the 18 instances on the Riffle Facebook page talking about cultural Marxism were my words. There's another post for which Professor Garrett was disciplined over. But he never — Professor Johnson was never punished for any of his postings on cultural Marxism, correct? A person of ordinary firmness taking a look at the long list of speech violations issued against Professor Garrett wouldn't be charged. Answer my question, though. Has Professor Johnson ever been prosecuted for any statements, postings, speeches, podcasts, interviews about cultural Marxism?  On cultural Marxism, no. But he stopped doing it when he saw that it was a violation. And he won't do it because he's told in the brief, notwithstanding some comments earlier, that we'll know when we see it. So we have a long list of — in fact, some of the things that Professor Garrett was charged with were actually things written by Professor Johnson or — But if he previously did it and was not published, but he is personally choosing not to do it, that's his choice, right? If I get away with it. He's the one that said, I'm the one that posted all those cultural Marxist posts, not Professor Garrett. And he was never punished for that. Yet. They're being sued right now, which is why perhaps they're being — But then get the enforcement and then come back. And then you'd completely have standing on that. Your Honor, the first — This is not a permanent exclusion. It's just saying, let's wait for the threat of enforcement to ripen. Your Honor, in the First Amendment, you don't need a specific threat of enforcement in order to have standing. It's enough that there is, you know, a reasonable chance that — that your conduct will incur official rebuke. And, in fact, standing is highly relaxed in a preenforcement situation under the First Amendment. If this — if Professor Johnson doesn't have standing to assert a First Amendment claim for being chilled when his colleague has been fired for saying and doing all the — a lot of the things that he wants to say, the other Chamber does. And finally, one last word. The disavowal also by the Chancellor is not exactly sufficient because the Chancellor will keep maintaining, promulgating, updating this guidance document. There's a continuing obligation that the Chancellor has to manage these competencies and criteria, and those will — will continue. Thank you, Your Honor. No, thank you. All right. We've taken everyone over time, but thank you for — that's — it was all permitted, so this matter is submitted. And thank you both for your — both sides for your argument. All rise. This court, for this session, stands adjourned.
judges: CALLAHAN, BADE, KOH